**UNITED STATES  DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

ROCKY HEBERT                                          CIVIL ACTION

VERSUS                                                       NO. 10-1530

CAPTAIN RONNIE BORER, WARDEN                 SECTION "F" (6)

## REPORT AND RECOMMENDATION

This matter was referred to the United States Magistrate Judge for the purpose of conducting hearings, including an evidentiary hearing, if necessary, and submission of proposed findings and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), and as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases.  Upon review of the entire record, the court has determined that this matter can be disposed of without an evidentiary hearing.   For the following reasons, it is hereby recommended that the instant petition be **DISMISSED WITH PREJUDICE**.

## I.  PROCEDURAL HISTORY

On June 16, 1999, petitioner, Rocky Hebert, presently incarcerated in the State Police Barracks located in Zachary, Louisiana, was convicted following trial by jury in the Thirty-Second Judicial District Court for the Parish of Terrebonne of attempted first degree

murder.[1]  Petitioner was sentenced to the maximum term of 50 years imprisonment at hard labor without benefit of parole, probation or suspension of sentence.  On November 3, 2000, the Louisiana First Circuit Court of Appeal affirmed petitioner's conviction and sentence. *State v. Hebert*, No. 1999-KA-2930 (La. App. 1 Cir. 2000) (unpublished opinion).[2]  On November 16, 2001, the Louisiana Supreme Court denied petitioner's writ application, *State v. Hebert*, 801 So.2d 1073 (La. 2001), thereby rendering petitioner's conviction and sentence final.

On January 22, 2003, petitioner filed an application for post-conviction relief with the state district court.[3]  After conducting two evidentiary hearings, the state district court, pursuant to its Judgment issued December 9, 2008, denied petitioner post-conviction relief.[4]  On January 8, 2009, petitioner timely sought relief from the Louisiana First Circuit in connection with the district court's adverse decision.  On April 27, 2009, the Louisiana First Circuit denied petitioner's writ application.  *State v. Hebert*, No. 2009-KW-0080 (La. App. 1 Cir. 2009) (unpublished opinion).[5]  On May 27, 2009, petitioner timely sought relief from the Louisiana Supreme Court in connection with the state appellate court's adverse

---

[1]A copy of the jury verdict is contained in the State rec., vol. 1 of 5.

[2]State rec., vol. 2 of 5, pp. 614-630.

[3]State rec., vol. 2 of 5, pp. 650-683.

[4]State rec., vol. 3 of 5, p. 1163.

[5]State rec., vol. 3 of 5, p. 1238.

decision.[6]  The Louisiana Supreme Court denied petitioner's writ application on April 5,

2010.  *State ex rel. Hebert v. State*, 31 So.3d 362 (La. 2010).

On April 22, 2010, petitioner timely filed the instant habeas corpus action,

raising the following claims for relief:  1) There was insufficient evidence to support his

attempted first degree murder conviction;[7] 2) the 50-year sentence he received in connection

with his attempted first degree murder conviction was excessive;[8] 3) the trial court erred in

admitting evidence regarding petitioner's prior bad acts, in denying petitioner's motion to

suppress his confession, in admitting into evidence petitioner's inculpatory statements, in

allowing the State to present prejudicial and inflammatory evidence, and in failing to swear

in the jury as a group;[9] 4) counsel was ineffective due to his failure to inform the trial judge

that police obtained an arrest warrant five days before petitioner provided his inculpatory

statements, his failure to object to the prosecutor's improper closing remarks, his failure to

object to the trial judge's erroneous comment concerning the responsive verdicts, his failure

to request a copy of the grand jury transcript, his failure to secure a proffered plea bargain,

---

[6] *See* Federal rec., doc. 9, pp. 5-6.

[7] Claim 1) is set forth as claim #2 in petitioner's supporting brief (rec. doc. 1).

[8] Claim 2) is set forth as claim #4 in petitioner's supporting brief (rec. doc. 1)

[9] Claim 3) represents a consolidation of claims #1, #3, #5, #12 and #13 as set forth in petitioner's supporting brief (rec. doc. 1).

and his failure to conduct a pre-trial investigation and subpoena witnesses;[10] 5) his constitutional rights were violated by virtue of the trial court's erroneous comment on the responsive verdicts and the State's erroneous instructions to the grand jury to obtain an indictment;[11] 6) his constitutional rights were violated by virtue of the grand jury's failure to issue a second indictment;[12] 7) his constitutional rights were violated when the prosecutor was allowed to reinstate the attempted first degree murder charge through the grand jury;[13] 8) his constitutional rights were violated by virtue of the prosecutor's refusal to recuse himself due to a conflict of interest;[14] and, 9) his constitutional rights were violated by virtue of the fact that prosecutors were allowed to choose the judge who would preside over petitioner's case.[15]  The State concedes that petitioner has exhausted his state court remedies as required under *Rose v. Lundy*, 455 U.S. 509, 102 S. Ct. 1198, 71 L. Ed. 2d 379 (1982). Accordingly, the court shall proceed to address the merits of petitioner's claims following its review of the pertinent facts and applicable standard of review.

---

[10]Claim 4) represents a consolidation of claims #6, #7, #9, #14, #15, and #16 as set forth in petitioner's supporting brief (rec. doc. 1).

[11]Claim 5) represents a consolidation of claims #8 and #18 as set forth in petitioner's supporting brief (rec. doc. 1).

[12]Claim 6) is set forth as claim #11 in petitioner's supporting brief (rec. doc. 1).

[13]Claim 7) is set forth as claim #17 in petitioner's supporting brief (rec. doc. 1).

[14]Claim 8) is set forth as claim #19 in petitioner's supporting brief (rec. doc. 1).

[15]Claim 9) is set forth as claim #10 in petitioner's supporting brief (rec. doc. 1).

## II.  FACTS[16]

About a month after she began dating petitioner, Sarah Larpenter discovered that she was pregnant.  She and petitioner decided to get married.  They moved several times during the course of Sarah's pregnancy and had financial difficulties due to petitioner's lack of work.  The baby, a girl named Andrea, was born on April 6, 1997, after an uneventful pregnancy.  Her condition at birth was completely normal.

During her first two and one-half months, Andrea was seen by her pediatricians for well baby visits and for respiratory infections, a common illness in infants.  On June 14, 1997, a hematoma on the baby's head was brought to the attention of the doctors and x-rays indicated swelling, but no broken bones.  Since there was nothing in the history to indicate that the baby had fallen or was dropped and a hematoma could happen in a variety of ways, child abuse was not suspected.  The baby was seen three more times before her June 23, 1997 follow-up appointment.  At this visit, Andrea's weight, which had fallen, returned to the level it was on June 11.  There were no visible signs of trauma and her upper respiratory infection was improving.

On June 24, the pediatricians' office received a call from Andrea's mother, who was worried about the baby's condition.  The infant was brought to the office and examined by Dr. Robert Clark.  When examining Andrea, the doctor noticed symptoms

---

[16]The facts are taken from the Louisiana First Circuit Court of Appeal's opinion, *State v. Hebert*, No. 1999-KA-2930 (La. App. 1 Cir. 2000) (unpublished opinion).

which indicated an altered level of consciousness and some brain damage.  Dr. Clark personally rushed the baby to the hospital's emergency room which was adjacent to his office.  Dr. Clark suspected spinal meningitis and ordered tests before the baby was transferred to Oschner Hospital in New Orleans which has a pediatric intensive care unit. Subsequently, Dr. Clark received x-ray results which showed that Andrea had multiple rib fractures in various stages of healing, an indication that the baby received injuries at different times and as long as two weeks before.  Dr. Clark notified the doctors at Oschner of these results and subsequent x-rays revealed that the baby had a broken leg and two broken wrists which were already healing.  Because the x-rays indicated severe trauma and child abuse, the Houma Police Department was notified.

On June 25, police detectives investigating the baby's injuries met with petitioner and his wife, advised them of their rights, and conducted interviews.  Neither parent admitted to knowing how the injuries occurred.  On June 27, the parents were again *Mirandized* and interviewed.  Again, petitioner did not admit to injuring the infant.  In the early morning hours of July 1, petitioner attempted suicide and was taken to the Terrebonne General Hospital emergency room.  Because petitioner said that he wanted to talk to the police, the police department was notified and Detective Hogenstad went to the hospital.  At that time petitioner told Detective Hogenstad that he had shaken the baby on June 24. Detective Ashli Richardson went to the hospital later that morning and took a statement from petitioner.  In this statement, petitioner admitted that on June 24, Andrea was whining and

that he shook her for a few seconds before she started having seizures.  A few weeks earlier he had shaken the infant when she was crying; he did not recall if he squeezed her, but admitted that Andrea's broken ribs could have been from that incident.  He denied knowing how the baby received the hematoma on her head, her broken leg or broken wrists.  He did recall, however, that while a nurse was preparing Andrea for an I-V, she bent the baby's wrist.  Petitioner further acknowledged that he had a bad temper caused by stress.  Subsequently, petitioner was arrested.

Despite her neurologist's expectation, Andrea lived.  She was described at the time of the trial as being blind, having very bad cerebral palsy, being mentally retarded, unable to talk, walk or roll over and having seizures.

## III.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law, and mixed questions of law and fact.  Provided that the state court adjudicated the claim on the merits, pure questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1) and questions of fact are reviewed under § 2254(d)(2).  *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000).

As to questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision unless it "was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court has noted:

> § 2254(d)(1)'s "contrary to" and "unreasonable application" clauses have independent meaning.  A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case.  The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in *Williams[ v. Taylor*, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002) (citations omitted).

As to questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Hill*, 210 F.3d at 485; 28 U.S.C. § 2254(e)(1).

## IV.  ANALYSIS

### A.  Insufficiency of Evidence

Petitioner argues that there was insufficient evidence to support the jury finding him guilty of attempted first degree murder.  Specifically, petitioner argues that the evidence was insufficient to support a finding that he specifically intended to kill his daughter.  In

support of his argument, petitioner points to the testimony of his wife, Sarah Hebert, who "testified that she didn't think the petitioner was capable of hurting the child, that he loved the child and shared her feelings toward the child . . . [and that] he told her to call the doctor after the child was injured."  (Rec. doc. 1, supporting brief, p. 12).  Petitioner also relies on the testimony of Dr. Douglas Postels who testified "that petitioner appeared to be concerned about the injuries to his daughter", along with his own testimony to the effect that he never had any intent to harm his daughter.  (Rec. doc. 1, supporting brief, p. 12).

 In addressing the instant claim in connection with petitioner's direct appeal, the Louisiana First Circuit Court of Appeal first examined applicable law as enunciated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), along with applicable state law.

> The standard of review for the sufficiency of evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime and defendant's identity as the perpetrator beyond a reasonable doubt.  *See* La. C.Cr.P. art. 821; *State v. Kelly*, 99-0412, p. 4 (La. App. 1st Cir. 12/28/99), 747 So.2d 760, 762.  The *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  When analyzing circumstantial evidence, La. R.S. 15:438 provides the fact finder must be satisfied that the overall evidence excludes every reasonable hypothesis of innocence.  *State v. Kelly*, 99-0412, pp. 4-5, 747 So.2d at 762.

*Hebert*, No. 1999-KA-2930, p. 5.

 Next, the Louisiana First Circuit examined the elements of first degree murder,

9

along with the elements of "attempt"and "specific intent".

Louisiana Revised Statute 14:30A(5) provides as follows:

First degree murder is the killing of a human being:

When the offender has the specific intent to kill or to inflict great bodily harm upon a victim who is under the age of twelve or sixty-five years of age or older.

Under La. R.S. 14:27A, a person is guilty of an attempt to commit an offense when he has a specific intent to commit a crime and "does or omits an act for the purpose of and tending directly toward the accomplishing of his object."

The gravamen of the crime of attempted murder, whether first or second degree, is the specific intent to kill and the commission of an overt act tending toward the accomplishment of that goal. Although specific intent to inflict great bodily harm may support a conviction for murder, such intent is insufficient to support a conviction for attempted murder. *See State v. Brunet*, 95–0340, p. 4-5 (La. App. 1st Cir. 4/30/96), 674 So.2d 344, 347, *writ. denied*, 96-1406 (La. 11/1/96), 681 So.2d 1258.

Specific criminal intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Since specific intent is a state of mind, it need not be proven as a fact, but may be inferred from the circumstances present and the actions of the defendant. *State v. Allen*, 94-1941, p. 9 (La. App. 1st Cir. 11/9/95), 664 So.2d 1264, 1271-72, *writ. denied*, 95-2946 (La. 3/15/96), 669 So.2d 433.

*Hebert*, No. 1999-KA-2930, pp. 5-6.

Thereafter, the state appellate court examined the evidence presented at trial.

Several doctors testified about Andrea's injuries and the cause of them. Dr. Clark noted the x-rays showed the broken ribs were in various stages of healing, an indication that the injuries happened at different times. The doctor explained that the bone in a two month old infant is not calcified; rather,

because the bones are elastic it would take a significant amount of trauma to cause a fracture. When asked about other possible causes of the infant's rib fractures, Dr. Clark explained that he had never heard of a baby's ribs being fractured because of trauma to the mother during pregnancy. However, he admitted that multiple automobile accidents could have caused the injuries. He could not say if the injuries could have happened in the twenty-four hours before the June 24 visit, but stated that Andrea's brain condition clearly had changed during that time period. Dr. Clark acknowledged that the blood in the spinal fluid obtained during the spinal tap could have been from hitting a vein, not the head injury. Dr. Clark agreed that the parents' willingness to bring the baby in for checkups could be an indication that they were concerned about her health.

Dr. David Fakier, an expert in radiology, testified that he interpreted the June 24 x-rays at Terrebonne General Hospital. He concluded the baby had multiple rib fractures, an unordinary, highly suspicious finding. He explained that because of the different amounts of callus around different ribs, there appeared to be various stages of healing, an indication that the fractures did not occur the same day. He opined that the fractures could have occurred two weeks before or at even an earlier date. If the fractures did not occur on more than one day, then they were the result of one tremendous incident in which the baby was squeezed significantly. Dr. Fakier further explained that because rib fractures were exceedingly uncommon in children (due to the elasticity of their bones), Andrea's x-rays were indicative of abuse and the use of a lot force. As to the possibility that the injuries occurred from the baby's car seat being thrown forward and hitting the dashboard of an automobile, Dr. Fakier stated he had never seen such injuries from that type of incident. The rib injuries were consistent with the baby being grabbed underneath the arms two weeks before, shaken violently and squeezed hard.

Dr. Vincent Denney, an Oschner Hospital orthopedic surgeon specializing in pediatrics, admitted that he could not state how the baby's injuries occurred. However, he explained that he applies his medical findings to the history given to determine if they are consistent. As the result of his examination of Andrea, he determined that she had multiple rib fractures, a left lower leg fracture and a right wrist fracture which occurred between ten days and three weeks prior to her admission to Oschner. The infant also had a left wrist fracture that occurred between seven and fourteen days before his examination of her. While the rib fractures were consistent with being grabbed

around the chest and being squeezed, shaking Andrea violently would  not have caused enough trauma to break her wrist or leg; rather, those injuries were consistent with her arms and legs striking an object or the baby being hit by an object.  He also stated that because Andrea's bones were of normal density for a baby of her age, it would have taken a significant amount of force to cause the fractures.  He opined that the amount of force used on the baby was serious, significant and violent.  Dr. Denney acknowledged, however, that the baby's fractures were not life threatening and were consistent with a motor vehicle accident that caused significant trauma.

Dr. Douglas Postels, a pediatric neurologist, also indicated that fractures in different stages of healing are indicative of child abuse.  In his examination of Andrea, he determined that she had retinal hemorrhaging, metaphysical fractures, and blood in the subarachnoid space, which are the three symptoms of shaken baby syndrome.  The doctor explained that he had been involved with twenty-two cases of this syndrome in his practice and that Andrea had the worst case of shaken baby syndrome that he had seen.  This type of syndrome involves more than just shaking a baby; the injuries occur from being thrown or swung against a stationary solid object.  Dr. Denney further stated a baby's fall out of a three story window would not produce as bad an injury as that which Andrea sustained.  He further testified that her injuries were not consistent with her car seat being thrown against an automobile console or with an automobile accident.

[Petitioner] called psychiatrist Dr. Harold Conrad to testify regarding his treatment of [petitioner] after the July 1, 1997 suicide attempt and a previous attempt in 1996.  Dr. Conrad diagnosed [petitioner] with adjustment disorder with depressed mood, a very broad diagnosis, which can occur in people under stress even without their knowledge or the need for psychiatric counseling.  Dr. Conrad indicated that [petitioner's] impulse control was impaired and reflected in his suicide attempt.  Although the baby's crying could have been a stimulus causing [petitioner] to overreact, Dr. Conrad did not diagnose [petitioner] with an impulse disorder.  Nor did he find evidence that [petitioner] suffered from an amnesic disorder.

[Petitioner] claimed that he has blackouts due to stress.  He testified that he did not remember much after his July 1, suicide attempt, including his statement to Detective Richardson.  However, he could not explain how the statement contained accurate information regarding his actions shortly before

the suicide attempt.  There was no support for [petitioner's] claim that he suffered from blackouts, other than his self-serving testimony.  His wife did not recall during their marriage that [petitioner] said he experienced blackouts.  His treating psychiatrist indicated that blackouts were not a symptom of [petitioner's] diagnosed disorder.

Regarding the June 24 incident, he recalled that after his wife bathed Andrea, he took the baby into the living room to dry her.  The next thing he realized he was shaking the baby.  He did not remember banging the infant's head against anything.  Andrea became quiet and he put her to bed.  When his wife came into the room, the child began having seizures. [Petitioner] denied that he intended to kill the baby and at the time did not believe that he had caused the child's injuries. [Petitioner] contradicted his wife's testimony that he did not want her to gain weight during the pregnancy or that he resented the attention she gave to the baby. [Petitioner] denied that he shook the baby before the June 24 incident or that he told Detective Richardson he had done so.

[Petitioner] attempted to blame the baby's injuries on an automobile accident.  However the incident, as explained in his wife's testimony, occurred when their automobile became stuck in a hole.  As they attempted to get out, the baby's car seat was thrown forward against the dashboard.  However, the child did not wake up or come out of the seat.  Drs. Clark and Denney testified that the baby's injuries could only have occurred during a major automobile accident or in multiple automobile accidents; Dr. Fakier had not seen multiple rib fractures occurring during an automobile accident.

Moreover, the medical testimony indicated that the baby's previous injuries and fractures were an indication of prior incidents of inflicted trauma and child abuse.  The baby's weight loss was consistent with rib fractures causing pain and reducing the baby's desire to suck.  As indicated by Dr. Postels, the injury to Andrea's brain could have only been caused by her moving head striking a stationary solid object, not by her falling or having something dropped on her.

*Hebert*, No. 1999-KA-2930, pp. 6-10.

Based upon the above, the Louisiana First Circuit reasoned:

13

> The evidence indicated the baby's injuries were due to a great amount of force; she had previous multiple injuries indicating prior abuse since her birth only two and one-half months before; [petitioner] admitted to shaking Andrea on June 24 and a few weeks earlier; ... [petitioner] had voiced concern about the amount of attention his wife was giving the infant; and there was no medical explanation for [petitioner's] alleged blackouts. Based on this and viewing all the evidence in the light most favorable to the state, any rational trier of fact could have concluded beyond a reasonable doubt, and to the exclusion of any reasonable hypothesis of innocence, that [petitioner] had the specific intent to kill and was guilty of attempted first degree murder.

*Hebert*, No. 1999-KA-2930, p. 10.

This court finds that the above reasoning on the part of the Louisiana First Circuit does not represent an unreasonable application of the law enunciated in *Jackson*, *supra*, to the facts of this case. Accordingly, the instant claim for habeas corpus relief is without merit.

**B. Excessive Sentence**

Petitioner asserts that the maximum sentence of 50 years imprisonment which the trial court imposed upon him is excessive. Petitioner argues that the trial court did not give adequate consideration to the mitigating circumstances that he was remorseful, under psychiatric care, and had no prior criminal history. Petitioner further claims that there were insufficient aggravating circumstances to warrant the imposition of the maximum sentence. In support of his excessiveness argument, petitioner cites only state law. However, even if one assumes that the sentence was, in fact, violative of state law, absent a constitutional violation, petitioner is not entitled to federal habeas corpus relief. *See generally Vardas v.*

14

*Estelle*, 715 F.2d 206, 208 (5th Cir. 1983), *cert. denied*, 465 U.S. 1104, 104 S.Ct. 1603, 80 L.Ed.2d 133 (1984).

As for petitioner's 50-year sentence, the maximum sentence applicable to one convicted of attempted first degree murder, the Supreme Court has specifically rejected the principle that the Eighth Amendment contains a proportionality guarantee. *Harmelin v. Michigan*, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991).[17]  If a sentence is within the statutory limits, a federal habeas court will not upset the terms of that sentence unless it is so disproportionate to the offense as to be completely arbitrary and shocking. *Bonner v. Henderson*, 517 F.2d 135, 136 (5th Cir. 1975); *see also Smallwood v. Johnson*, 73 F.3d 1343, 1347 (5th Cir. 1996) (emphasizing that a federal court will not review a state sentencing without a threshold showing that the sentence is "grossly disproportionate to the offense").

In addressing petitioner's excessiveness argument on direct appeal, the Louisiana First Circuit Court of Appeal first examined the requirements, under state law, which a trial court must satisfy in sentencing a criminal defendant and whether the trial court, in petitioner's case, met those requirements.

The Code of Criminal Procedure article 894.1 sets forth items which must be considered by the trial court before imposing sentence.  The trial court

---

[17]In *Harmelin*, 501 U.S. at 962, 111 S.Ct. at 2684, quoting *Rummel v. Estelle*, 445 U.S. 263, 274, 100 S.Ct. 1133, 1139, 63 L.Ed.2d 382 (1980),  the Supreme Court reaffirmed that "'for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative.'"

need not recite the entire checklist of Article 894.1, but the record must reflect that it adequately considered the guidelines. *State v. Herrin*, 562 So.2d 1, 11 (La. App. 1st Cir.), *writ denied*, 565 So.2d 942 (La. 1990). In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. *State v. Watkins*, 532 So.2d 1182, 1186 (La. App. 1st Cir. 1988).

　　　　For his conviction of attempted first degree murder, [petitioner] was exposed to a maximum sentence of fifty years at hard labor. *See* La. R.S. 14:27D(1) and 30C. In imposing the maximum sentence, the trial court indicated that it was mindful of the sentencing guidelines, it was satisfied there was an undue risk during the period of a suspended sentence that [petitioner] would commit another crime and [petitioner] was in need of correctional treatment or a custodial environment. The court further found that [petitioner's] actions caused permanent injury and effectively took away the life of the victim, that his conduct manifested deliberate cruelty to the victim and he knew or should have known that the infant was particularly vulnerable or incapable of resisting. The court acknowledged it normally did not impose maximum sentences in cases that proceed to trial, but found such a sentence was warranted in this case.

　　　　It is obvious the trial court found no or few mitigating factors in this case. The court noted the particular aggravating circumstances which it considered in determining the sentence to impose. Our review of the sentencing transcript indicates the trial court adequately complied with the Article 894.1 guidelines.

*Hebert*, No. 1999-KA-2930, pp. 15-16.

　　　　The state appellate court next examined state criteria, which essentially mirror federal criteria, which must be considered in determining whether a sentence is unconstitutionally excessive.

　　　　Article I, Sec. 20, of the Louisiana Constitution of 1974 prohibits the imposition of excessive punishment. A sentence within the statutory limits may nonetheless violate a defendant's constitutional right against excessive

> punishment and is subject to appellate review. *State v. Sepulvado*, 367 So.2d 762 (La. 1979). Generally, a sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one's sense of justice. A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. *State v. Wallace*, 98-2450, p. 7 (La. App. 1st Cir. 9/24/99), 754 So.2d 991, 996. This court has stated that the maximum sentence may be imposed only in cases involving the most serious offenses and worst offenders. *State v. Easley*, 432 So.2d 910, 914 (La. App. 1st Cir. 1983).

*Hebert*, No. 1999-KA-2930, p. 16.

> Thereafter, the state appellate court reasoned:

> The record does not support [petitioner's] claim that the sentence is disproportionate to the offense or excessive. It is apparent [petitioner's] actions imposed considerable pain on the infant during the first two and one-half months of her life. Additionally, despite the fact that the infant miraculously survived her injuries, [petitioner] took away any type of a normal life this child may have had and put her in a position of requiring constant care. Thus, as stated by the trial court, because [petitioner] effectively took away the life of this child, we cannot say that the maximum sentence of fifty years was excessive.

*Hebert*, No. 1999-KA-2930, pp. 16-17.

> This court finds that the above-reasoning does not constitute an unreasonable application of pertinent Supreme Court law to the facts of this case. Accordingly, the instant claim is without merit.

### C. Errors on the Part of the Trial Court

> Petitioner argues that he is entitled to federal habeas corpus relief based upon

17

the following alleged errors on the part of the trial court:    1) Error in admitting evidence of

prior bad acts; 2) error in denying motion to suppress his confession; 3) error in admitting

inculpatory statements; 4) error in admitting prejudicial and inflammatory evidence; and,

5) error in failing to swear in jury as a group.

It is well established that federal habeas review is limited to questions of

constitutional dimension.  *See generally Jernigan v. Collins*, 980 F.2d 292, 298 (5th Cir.

1992), *cert. denied*, 508 U.S. 978, 113 S.Ct. 2977, 125 L.Ed.2d 675 (1993); *Castillo v.

Johnson*, 141 F.3d 218, 222 and 224 (5th Cir.), *cert. denied*, 524 U.S. 979, 119 S.Ct. 28, 141

L.Ed.2d 788 (1998).  In reviewing a state court's alleged trial errors, such as the ones set

forth above, the federal habeas court's role "'is limited to determining whether a trial judge's

error is so extreme that it constituted denial of fundamental fairness.'"  *Andrade v. McCotter*

805 F.2d 1190, 1193 (5th Cir. 1986), *quoting Mattheson v. King,* 751 F.2d 1432, 1445 (5th

Cir.1985).

### 1. Error in Admitting Evidence of Prior Bad Acts

Petitioner argues that the trial court erred in allowing the State to introduce

evidence regarding fractures to the victim's legs, wrists, and ribs because no evidence was

produced reflecting that petitioner inflicted these injuries, i.e., that petitioner committed these

"prior bad acts".  However, in rejecting petitioner's argument, the Louisiana First Circuit

noted that the trial court did not err in admitting evidence of broken bones suffered by the

victim because said evidence was not introduced for the purpose of showing prior bad acts

on the part of petitioner.  Instead, the evidence was submitted to show that the child's brain injury, an injury discovered on June 24, 1997, that was linked to actions on the part of petitioner, was the result of intentional child abuse, rather than, as suggested by petitioner, the result of an accident.  Specifically, the state appellate court reasoned:

> In *State v. Koon*, 31, 177, pp. 9-11 (La. App. 2nd Cir. 2/24/99), 730 So.2d 503, 510-511, the defendant contended that since the state failed to link prior injuries to the defendant, the trial court erred in allowing the state to introduce evidence of the child's prior injuries.  After a pre-trial hearing, the trial court ruled that evidence of the child's prior injuries was not admissible as other crimes evidence.  However, the trial court ruled that this evidence of the child's prior injuries was admissible as evidence that the child suffered from child abuse syndrome and as evidence of the condition of the child's body at the time of death.  The Second Circuit, relying on *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), held that the trial court did not err in finding the testimony concerning the child's prior injuries to be admissible evidence of child abuse syndrome.  The court stated:
>
>> The evidence of the prior injuries was relevant to prove the intent requirement of second degree murder.  The evidence demonstrating battered-child syndrome assisted in proving that the child died at the hands of another and not by falling off of a bed, and this evidence also tends to show that the person inflicted the injuries intentionally.  *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).  When offered to show that certain injuries are a product of child abuse, rather than an accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who inflicted the injuries.  *Estelle v. McGuire*, *supra*.
>
> *State v. Koon*, 31,177 at p. 10, 730 So.2d at 511.
>
> Herein, the evidence of the prior injuries was relevant to prove that the injuries sustained on June 24 were not the result of an accident, such as falling or unintentionally squeezing the child too hard.  This evidence was used by the doctors to determine how the injuries occurred, to show that someone intentionally inflicted the injuries and that they were not caused by accident.

19

> When offered to show that certain injuries are a product of child abuse, rather than an accident, evidence of prior injuries is relevant even though it does not purport to prove the identity of the person who inflicted the injuries. *Estelle v. McGuire*, 502 U.S. at 68, 112 S.Ct. At 480.

> Thus, because the evidence of Andrea's prior injuries was not evidence of other crimes or bad acts committed by [petitioner], the evidence did not constitute other crimes evidence. It was not used to show that [*petitioner*] inflicted the injuries, rather to show that the injuries were inflicted *intentionally* by *someone*.... Thus, there was no error in the introduction of this evidence....

*Hebert*, No. 1999-KA-2930, pp. 11-12 (emphasis original).

Based upon the above, it is clear that the trial court did not commit an evidentiary error in admitting evidence of the victim's prior injuries, specifically, the bone fractures, and petitioner suffered no due process violation as a result of the admission of said evidence. Accordingly, the instant claim for habeas relief is without merit.

## 2. Error in Denying Motion to Suppress Confession

Petitioner argues that the trial court erred in admitting into evidence his written confession because the confession was given a day after he had been admitted to the hospital for attempting to commit suicide, it was written by a police detective and merely signed by him, there were no witnesses present when he provided this confession, and there was no medical testimony to rebut his testimony that he could not remember giving a statement to police.

Petitioner raised this same argument on direct appeal and, in addressing said claim, the state appellate court first examined applicable state law.

Before a confession or inculpatory statement can be introduced into evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements, or promises. La. R.S. 15:451; *State v. Daughtery*, 563 So.2d 1171, 1177 (La. App. 1st Cir.), *writ denied*, 569 So.2d 980 (La. 1990). The state has the burden of proving the voluntariness of a confession or inculpatory statement beyond a reasonable doubt. *State v. Johnson*, 533 So.2d 865, 867 (La. App. 1st Cir. 1989), *writ denied*, 558 So.2d 600 (La. 1990). The admissibility of a confession is in the first instance a question for the trial court. Its conclusions on the credibility and weight of testimony relating to the voluntariness of the confession for the purpose of admissibility will not be overturned on appeal unless they are not supported by the evidence. *State v. Daughtery*, 563 So.2d at 1177.

*Hebert*, No. 1999-KA-2930, p. 13.

Thereafter, the Louisiana First Circuit reviewed the evidence provided regarding the voluntariness of petitioner's written confession and, based upon same, determined that the trial court did not err in admitting petitioner's written confession .

At the suppression hearing, Detective Ashli Richardson testified that about 9:45 a.m. on July 1, she went to the hospital to interview [petitioner]. She was aware that [petitioner] had attempted suicide, was admitted to the hospital around 1:30 a.m. and had admitted to Detective Hogenstad that he had shaken Andrea on June 24. Detective Richardson advised [petitioner] of his rights and [petitioner] indicated he understood them. [Petitioner] narrated a statement, written by Detective Richardson, in which he indicated that he had shaken Andrea before she started having seizures on June 24. He had also shaken and squeezed her a few weeks earlier. He denied knowing how the infant obtained her head injuries or broken extremities. [Petitioner] conceded, though, that he had a bad temper caused by stress.

Detective Richardson admitted that [petitioner] was a patient in a regular room at the hospital when she interviewed him. She did not recall if he had an I-V in his arm. Detective Richardson explained that because of Detective Hogenstad's interview with [petitioner] about eight hours earlier, she did not talk to [petitioner's] doctor or the nurses to ascertain if he was in a

condition to answer questions.  At trial, the detective stated that [petitioner] appeared coherent and understood his actions at the time of his written statement.  There were no threats or coercion to induce the statement. Detective Richardson read and explained a waiver of rights form to [petitioner] and he signed it.  She further testified the reason that she wrote the statement was not due to [petitioner's] state of mind; she explained in interviews she normally writes or types narrated statements.

Despite [petitioner's] contention that the voluntariness of his statement was vitiated by his condition at the time he narrated the statement, there was no medical evidence presented that his condition was such that he was unable to understand his rights and waive them or that his statement was not voluntarily given.  *See State v. Johnson*, 553 So.2d at 867.  Instead, the evidence indicates [petitioner] was coherent at the time he was advised of, understood and waived, his rights and that there were no inducements to cause him to give the statement.

Considering the above testimony from the suppression hearing and the trial, we conclude the trial court correctly denied [petitioner's] motion to suppress.

*Hebert*, No. 1999-KA-2930, pp. 13-15.

This court finds the above reasoning to be sound and that petitioner, by virtue of the admission of his written confession, suffered no due process violation.  Accordingly, the instant claim for habeas corpus relief is without merit.

### 3.  Error in Admitting Inculpatory Statements

Petitioner argues that the inculpatory statements which he provided to police officials, specifically, Detective Hogenstad and Detective Richardson, after June 26, 1997, were improperly admitted at trial in light of the fact that on June 26, 1997, a warrant for his arrest had been issued.  Petitioner asserts that officials purposely delayed executing the arrest

warrant in order to gain a tactical advantage against him.  Had they properly executed the

warrant, he would have had the benefit of counsel and would have asserted his right to

remain silent.  As such, petitioner contends that the statements were obtained in violation of

his constitutional rights and, had the trial court been aware of the fact that a warrant for his

arrest had been executed prior to the time he made these statements, the trial court would not

have allowed evidence regarding the statements to be admitted at trial.

In addressing this issue on post-conviction in its June 24, 2004 "Reasons for

Order",[18] the state district court reviewed the testimony provided during a hearing conducted

by the trial court in response to petitioner's motion to suppress.

> The court has reviewed the transcript of the suppression hearing
> conducted on June 14, 1999.  According to the testimony of Detective
> Hogenstad, he spoke to [petitioner] on two occasions prior to July 1, 1997,
> namely, June 25, 1997, and June 27, 1997.  Each time he advised him of his
> *Miranda* rights before speaking to him.  On July 1, 1997, Detective Hogenstad
> went to Terrebonne General Hospital to speak to Mr. Hebert again because Mr.
> Hebert summoned the police in order to make a statement to them.  At that
> time he was cautioned that he did not have to speak to the police.  In the
> presence of at least two of his family members, he made inculpatory
> statements about the crime under investigation.
>
> Later that day, Detective Hogenstad returned to the hospital with
> Detective Richardson.  Again, Mr. Hebert was advised of his *Miranda* rights
> and Detective Richardson wrote a statement for him to sign.  Detective
> Richardson testified at the suppression hearing and confirmed that she wrote
> a statement for the defendant to sign based on his oral statements to her.  She
> explained that she *Mirandized* [petitioner] before speaking to him.  The next

---

[18]A copy of the state district court's "Reasons for Order" is contained in the State rec.,
vol. 2 of 5, pp. 745-765.

day Detective Richardson was present while [petitioner] was being transported to another hospital.   She testified he made spontaneous additional incriminating statements to her at that time.

Mr. Hebert's father, Lawrence Hebert, and uncle, Tommy Malbrough, also testified at the suppression hearing.  They contradicted the testimony of Detective Hogenstad, claiming that he did not caution [petitioner] before allowing him to speak.   They also denied that [petitioner] made the incriminating statements to which Detective Hogenstad testified.

State rec., vol. 2 of 5, pp. 747-748.

Thereafter, the state district court examined applicable law.

In addition to other federal and state due process requirements, under Louisiana law a confession or other inculpatory statement is not admissible into evidence unless the state proves the confession was given freely and voluntarily, and without "influence of fear, duress, intimidation, menaces, threats, inducements or promises." La. R.S. 15:541.  A defendant has a right against self-incrimination, and any waiver of that right must be given voluntarily, knowingly, and intelligently.   Coercive police activity is a necessary predicate to a finding that a confession was not voluntary, at least within the meaning of federal and state guarantees of due process.   The voluntariness of the waiver of any Fifth Amendment privilege depends upon the absence of police overreaching, not on any "free choice" of the defendant. *Colorado v. Connelly*, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986); *State v. Comeaux*, 514 So.2d 84 (La. 1987).  It is apparent that factors other than coercive police activity that cause a defendant to make incriminating statements, do not render such statements inadmissible as violative of constitutional protections.   Many admissible confessions have been made under the influence of factors such as feelings of guilt or remorse, or the erroneous belief by a suspect that the incriminating nature of his statements has not been or will not be discovered.

State rec., vol. 2 of 5, pp. 749-750.

Applying the suppression hearing testimony to the applicable law, the state district court reasoned:

In this case, [petitioner] argues that the failure of the police to execute the arrest warrant, or to advise him of its existence prior to questioning, amounted to coercive police activity, or otherwise rendered the waiver of his right against self-incrimination less than voluntary. The court does not believe that this inaction on the part of the police amounted to such coercion, and the court will not speculate as to what [petitioner] would have done or would not have done if he had been fully informed of the existence of the arrest warrant or if he had been arrested sooner. The failure of the police to arrest a suspect or advise him of the existence of an arrest warrant when the requirements of the *Miranda* case are adhered to, does not render the suspect's inculpatory statements inadmissible.

For the foregoing reasons, the petitioner's claim that new[ly] discovered evidence about the existence of a warrant for his arrest prior to questioning by the police, if known by the trial judge, would have required a contrary ruling on the motion to suppress, is without basis in the law.

State rec., vol. 2 of 5, pp. 750-751.

This court finds that the above reasoning represents a reasonable application of applicable law to the facts and that petitioner suffered no violation of his right to due process by virtue of the trial court's admission of evidence regarding his inculpatory statements. As such, the instant claim for habeas corpus relief is without merit.

### 4. Error in Admitting Prejudicial and Inflammatory Evidence

Petitioner argues that he was denied due process by virtue of the trial court's action in allowing the victim, Andrea Hebert, to be presented to the jury via the testimony of the victim's maternal grandmother, Judy Larpenter. Specifically, Judy Larpenter was called as a witness by the State and her testimony merely consisted of identifying herself and her relationship to the victim, all the while, over the objection of defense counsel, holding

the victim in her arms.  Petitioner contends that the prejudice associated with Larpenter's

testimony, offered while holding the victim in her arms, outweighed its probative value and

violated his right to a fair trial.

Petitioner raised this same argument on post-conviction and the state district

court denied petitioner's claim, reasoning:

> When there is an allegation that the prejudicial effect of evidence
> outweighs its probative value, the trial court is vested with great discretion in
> determining whether to admit the evidence.  In this case, in light of the other
> evidence presented by the state, the appearance of the child before the jury
> certainly was not critical to the state's case against the defendant.  Although
> the appearance was relevant, if for nothing more than to confirm the existence
> of the child as a human being, a prerequisite to a conviction for attempted first
> degree murder, a more prudent court would not have allowed the exhibition.
> That does not mean the child's appearance raised the prejudice against the
> defendant in the eyes of the jury to a level violative of his right to a fair trial.
>
> In this case, the court does not believe the trial court abused its
> discretion or, in the alternative, that the prejudice generated by Andrea
> Hebert's appearance before the jury, violated [petitioner's] right to a fair trial.
> The child's appearance was of extremely limited duration, inasmuch as only
> four questions were addressed to the grandmother as she held the child in her
> arms.  In his instructions to the jury later in the trial, the trial judge specifically
> advised the jury that it was not to be influenced by "sympathy, passion,
> prejudice, or public opinion."  In light of these circumstances, the court will
> not grant [petitioner] post conviction relief based on the appearance of his
> child before the jury during the testimony of her grandmother.

State rec., vol. 2 of 5, p. 760.

This court finds the above reasoning to be sound.  The trial court's admission

of Judy Larpenter's testimony while holding the victim in her arms did not deny petitioner

a fair trial in light of the strength of the State's case against petitioner, bolstered by

26

petitioner's properly admitted inculpatory statements.

### 5.  Error in Failing to Swear in Jury as a Group

Petitioner argues that the trial court erred in failing to swear the jury in as a group as required under La. C.Cr.P. art. 790.  Article 790 provides, in pertinent part:  "When selection of jurors and alternate jurors has been completed, ... the jurors shall then be sworn together to try the case in a just and impartial manner...."

In addressing the instant claim in connection with petitioner's post-conviction application, the state district court observed:

> The trial transcript and the court minutes in this case indicate two jury panels were selected before voir dire examination of either panel began.  Upon completion of the examination of the first panel, six jurors were selected and sworn together.  Six additional jurors and one alternate juror were selected from the second panel and sworn together.  After a lunch recess, all the jurors and the alternate juror returned to the courtroom and simultaneously received preliminary instructions from the court.  No further swearing of the jury occurred.

State rec., vol. 2 of 5, p. 761.

Based upon the above, the state district court determined that the jurors in petitioner's case had not been sworn in accordance with Article 790.  However, the court further determined that petitioner suffered no prejudice as a result of the trial court's violation of Article 790 and, as such, the trial court's error was harmless and post-conviction relief was not warranted.  State rec., vol. 2 of 5, p. 761.

As this court noted earlier, federal habeas corpus relief is not warranted by a

27

violation of state law, in this case, La.C.Cr.P. art. 790, absent a violation of petitioner's constitutional rights. As the state district court observed, petitioner suffered no constitutional violation by virtue of the fact that members of his jury were not all sworn in together. Thus, habeas corpus relief is not warranted.

### D.  Ineffective Assistance of Counsel

Petitioner argues he received ineffective assistance of counsel due to the following action, or inaction, on the part of trial counsel: 1) Counsel failed to inform the judge that police obtained an arrest warrant five days before petitioner provided his inculpatory statements; 2) counsel failed to object to the prosecutor's improper closing remarks; 3) counsel failed to object to the judge's erroneous comment concerning the responsive verdicts; 4) counsel failed to request a copy of the grand jury transcript; 5) counsel failed to secure proffered plea bargain; and, 6) counsel failed to conduct a pre-trial investigation and failed to subpoena witnesses.

The seminal Supreme Court decision regarding ineffective assistance of counsel is *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), wherein the Court held that in order to prove that counsel was unconstitutionally ineffective, petitioner must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, it may dispose of the claim without addressing the other prong.

28

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" *Lockhart v. Fretwell*, 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed. 2d 180 (1993), *citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. To prove prejudice under the *Strickland* standard, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. As reflected below, petitioner has failed to satisfy his burden of proof.

### 1. Failure to Inform Trial Judge of Arrest Warrant

Petitioner argues that counsel was unconstitutionally ineffective due to counsel's failure to inform the trial court that a warrant had been issued for his arrest before he provided his inculpatory statements to police officials. However, as noted above, the fact that a warrant had been issued for petitioner's arrest prior to speaking to police and providing inculpatory statements did not adversely affect the admissibility of his inculpatory statements. That is, the trial court's knowledge of the arrest warrant would not have warranted a different opinion regarding petitioner's motion to suppress. The inculpatory statements would still have been deemed admissible. Thus, petitioner was not prejudiced by counsel's alleged deficiency in failing to inform the court regarding the date a warrant was executed for his arrest. As such, petitioner has failed to make the required showing, under *Strickland*, *supra*, to obtain habeas relief.

29

### 2.  Failure to Object to Prosecutor's Improper Closing Remarks

Petitioner claims that trial counsel was ineffective in failing to object, during the prosecutor's closing argument, when he advised jurors not to "insult these people" by returning a lesser verdict responsive to the charge of attempted first degree murder and, if they were going to insult them, they should just come back with a not guilty verdict.  The prosecutor went on to say, "Don't fool yourself, this is a first degree attempted murder, nothing less."  (Rec. doc. 1, supporting brief, pp. 23-24).

In addressing this claim in connection with petitioner's post-conviction application, the state district court determined that petitioner was not entitled to post-conviction relief because he was not prejudiced by the prosecutor's remarks.  Specifically, the court determined that the remarks were not so egregious that they "inflamed the passion or prejudice of the jury and thus, contributed to the jury."  State rec., vol. 2 of 5, p. 752.  The court found this to be "especially true in light of the fact that the trial court instructed the jury that 'statements and arguments made by the attorneys are not evidence' ... and that the closing arguments 'are not to be considered as evidence....'" *Id*.

This court agrees with the state district court's determination that petitioner suffered no prejudice.  Thus, his ineffectiveness claim is without merit.

### 3.  Failure to Object to Erroneous Responsive Verdict Comment

Petitioner argues that counsel was unconstitutionally ineffective due to his failure to object to the trial court's alleged erroneous comment regarding the jury's ability

to return a responsive verdict.  As explained by the state district court in addressing the instant claim on post-conviction, the trial court instructed jurors on the applicable law regarding the offense charged, i.e., attempted first degree murder, along with the applicable law regarding the responsive verdicts of attempted second degree murder, attempted manslaughter, and aggravated battery.  During deliberations, the jury sent the following communication: "The jury would like to be able to review in writing the difference between 1st and 2nd attempted degree murder."  In response, the trial court repeated the original instructions regarding attempted first degree murder and attempted second degree murder. Thereafter, the trial court advised:

> The point is this, these responsive verdicts do not have to necessarily fit the facts.  They are alternatives available to you to choose from, if you wish to do so.  It doesn't necessarily mean that the evidence proves that, or any one of these things, other than first degree murder, okay.  I don't know how to put it any plainer than that, but they are here for your review as whatever one of these things, they are lesser included offenses.  Of course, this is what is on your mind, which you shouldn't be concerned with, it is the duty of the court to do the sentencing.  But some of these things carry lesser sentences than the others, obviously, if they are lesser included offenses, okay.

State rec., vol. 2 of 5, pp. 752-753.

Petitioner argues that the above comment had the effect of precluding the jury from returning a lesser verdict.  Specifically, petitioner alleges that the trial judge's comment to the effect that the jury should not be concerned with sentencing, precluded the jury from returning a lesser verdict.

This court is at a loss to understand the basis of petitioner's argument.  As the

state district court, in rejecting the instant claim, noted:

> The [trial] court correctly advised the jury that "it is the duty of the court to do the sentencing." The court correctly advised the jury that it should not be concerned with the sentencing, but that, obviously, the responsive verdicts carried lesser sentences. Nothing said by the judge and quoted above leads one to reasonably conclude that the jury was [misled] into believing it could only return a verdict of guilty of attempted first degree murder. In fact, to [petitioner's] benefit, the judge made it clear that the jury had the option to return a verdict for a lesser offense even if the facts justified a conviction for the offense charged. Why the jury chose to return a verdict for attempted first degree murder instead of a responsive verdict can only be the subject of speculation.
>
> In sum, the comments about which [petitioner] complains were not detrimental to him and give him no basis to complain.

State rec., vol. 2 of 5, pp. 753-754.

This court finds the above conclusion on the part of state district court to be correct. Petitioner has no basis to complain about the trial court's responsive verdict comment and counsel had no basis to object to the trial court's comment. As such, petitioner has failed, as required under *Strickland*, *supra*, to show any deficiency on the part of counsel and, therefore, his ineffectiveness claim is without merit.

### 4. Failure to Request Copy of Grand Jury Transcript

Petitioner argues that counsel was ineffective in failing to request a transcript of the grand jury proceedings based upon his claim that the grand jury was provided with improper instructions regarding the crime of attempted first degree murder. Petitioner's argument in this regard is based upon the fact that the grand jury indicted him for attempted

32

first degree murder, charging that he did "unlawfully and intentionally attempt to kill or inflict great bodily harm upon one, Andrea Hebert, in violation of La. R.S. 14:27/30A(5)...." State rec., vol. 2 of 5, p. 757.  Subsequently, the prosecutor amended the indictment to eliminate the phrase, "or inflict great bodily harm upon one", realizing that an intent to inflict great bodily harm could not be used to support a conviction for **attempted** first degree murder.  Based upon this amendment, petitioner argues that the grand jury received improper instructions regarding the proper basis for a charge of attempted first degree murder and that counsel was ineffective for failing to obtain a transcript of the grand jury proceedings to support this argument.

Once again, petitioner has failed to show how he was prejudiced by counsel's alleged deficiency in failing to obtain a transcript of the grand jury proceedings.  As the state district court, in connection with petitioner's post-conviction proceeding, observed:

> Even assuming [petitioner] could show erroneous instructions to the grand jury by the prosecutor, there is no reasonable probability that those instructions in any way contributed to the trial jury's verdict of guilty in this case. [Petitioner] has not alleged that the action of the <u>trial jury</u> was affected by the offending language of the indictment.  He could hardly make such an allegation since the trial jury never saw the indictment or heard the stricken phrase.

State rec., vol. 2 of 5, p. 758 (emphasis original).

### 5. Failure to Secure Proffered Plea Bargain

Petitioner argues that counsel was ineffective due to his failure to secure a plea

bargain agreement offered by the prosecution.  In support of his claim, petitioner submits a letter dated February 4, 1998 from his then attorney, Norval Rhodes, to Assistant District Attorney Bradley Doyle, providing, in pertinent part:  "[P]lease be advised that my client accepts the plea bargain arrangement that was conducted in Judge Wimbish's Chambers on Monday, February 2, 1998, wherein the Judge stated he would sentence Mr. Hebert to six (6) years in the Department of Corrections."[19]  Petitioner asserts "that Mr. Rhodes [sic] actions thereafter resulted in the withdrawal of the plea offer and ultimately led to petitioner's sentence of fifty years."  (Rec. doc. 1, supporting brief, p. 40).

Based, in part, upon the above-referenced letter, the state district court, in connection with petitioner's post-conviction application wherein he raised this identical claim, conducted two evidentiary hearings, one on June 13, 2007, and a second on July 17, 2008.  The state district court summarized the evidence submitted at these hearings as follows:

At the evidentiary hearing conducted on June 13, 2007, the court received testimony from Mark Rhodes, the assistant district attorney who prosecuted Mr. Hebert.  He testified that he worked for the local district attorney's office before January, 1997, and after June or July of 1998.  By the time he returned to his former employment as a prosecutor, the charges against Mr. Hebert were over a year old.  He confirmed that he sent a letter dated July 10, 1998, to Mr. Hebert's attorney Norval Rhodes, at his address in Houma indicating his willingness to honor a previous offer of fifteen years imprisonment in exchange for [petitioner's] plea of guilty to a charge of

---

[19]A copy of the above-referenced letter is attached to petitioner's habeas corpus application as exhibit B.

cruelty to a juvenile by August 5, 1998.  He also confirmed that he sent a letter dated August 19, 1998, to Norval Rhodes once again, this time to his address in Little Torch Key, Florida, confirming the offer of fifteen years imprisonment, but with modifications to the charges.   Mr. Rhodes, the prosecutor, clearly imposed a deadline of September 14, 1998, with regard to this offer.  In his correspondence, the prosecutor never indicated what role, if any, Judge Paul Wimbish, the judge assigned to handle the case, played in confecting any plea offer.

The prosecutor, Mr. Rhodes, in the August 19, 1998, letter confirmed that he had spoken to "Jim Alcock" and that Mr. Alcock informed him that he had no objection standing in for Mr. Rhodes, the defense attorney, when Mr. Hebert entered his plea, apparently in an effort to avoid the need for Mr. Rhodes to travel to Houma from Florida.

Brad Doyle, another prosecutor with the district attorney's office, testified at the hearing.   He confirmed that he was one of the original prosecutors of the case against Mr. Hebert and that before Mark Rhodes took over prosecution of the case, there were discussions about a sentence of six years imprisonment in exchange for a plea of guilty by Mr. Hebert.  Mr. Doyle testified he did not recall speaking to Judge Wimbish about a six year sentence or any other plea bargain arrangement.  Based on Mr. Doyle's testimony, it is apparent to the court that more probably than not, the district attorney's office abandoned any effort to resolve the case against Mr. Hebert in exchange for a six year jail term because of objections from the victim's family.

The defendant Rocky Hebert testified on the second day of the evidentiary hearing on July 17, 2008.  He confirmed that he and his attorney Norval Rhodes discussed a six year prison sentence in exchange for a guilty plea, and that he appeared in court on February 6, 1998, to take the deal.  It was his understanding that he was not permitted to plead on that day because the victim's family had not been notified that he was to appear in court and they were not present.  Subsequently, he agreed to plead guilty in exchange for a fifteen year jail sentence.  He admitted he read the correspondence from the prosecutor Mr. Rhodes before the deadline of September 14, 1998, imposed by the prosecutor, and that he knew about the deadline.  Mr. Hebert admitted that at no time up to and including his trial did he or any attorney representing him insist on pleading pursuant to any alleged pre-trial plea offer.  According to Mr. Hebert, by September 14, 1998, his attorney Norval Rhodes did not

represent him any longer.

At the hearing on July 17, 2008, the court received as evidence the May 8, 2008, deposition of Norval Rhodes. Mr. Rhodes testified that he represented Rocky Hebert initially and remembered having plea discussions in the case with Judge Wimbish and the prosecutor. He confirmed that his client was offered an opportunity to plead guilty in exchange for a sentence of six years in prison. He could not recall why the deal did not materialize. He had no recollection of any other offer, including any offer to plead guilty in exchange for a fifteen year prison sentence. He denied any recollection of discussing the fifteen year offer with Mr. Hebert. Mr. Rhodes did confirm that he referred Mr. Hebert's case to James Alcock, a Terrebonne Parish criminal defense attorney sometime in the summer of 1998, before the September 14, 1998, deadline imposed by the district attorney's office.

This court has reviewed the minutes of court dated September 14, 1998. The minutes reflect that Mr. Hebert and his attorney Norval Rhodes both appeared before the court on that day and that the prosecutor Mark Rhodes was also present. At that time, Norval Rhodes moved to withdraw as counsel for the defendant and his request was granted. The prosecutor advised the court that the pre-trial offer of fifteen years imprisonment had been declined by [petitioner]. The minutes clearly state as follows: "The accused stated that he declined the plea bargain."

State rec., vol. 3 of 5, pp. 1168-1170.

Based upon the above evidence, the state district court concluded that the fifteen-year plea agreement was not consummated because petitioner opted to take the risk of going to trial rather than accepting the proffered plea bargain. Petitioner argues that the state court's finding of fact in this regard is erroneous because it is based on court minutes reflecting the prosecutor's representation that petitioner declined to accept the plea bargain rather than "a transcript of the proceedings showing petitioner declining the plea offer." (Rec. doc. 1, supporting brief, p. 42).

36

"Our standard of review in an AEDPA case is well-established:  deference must be given to factual findings of the state court in the absence of clear and convincing evidence to the contrary."  *Hayes v. Thaler*, 361 Fed. Appx. 563, 565 (5th Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)).  Having reviewed the evidence taken in connection with the two evidentiary hearings conducted by the state district court,[20] this court finds no "clear and convincing evidence" undermining the deference to which the state court's factual finding, that petitioner turned down the plea agreement, is entitled.  Accordingly, this court finds petitioner's claim that the plea agreement was scuttled as a result of ineffective assistance of counsel to be without merit.

### 6.  Failure to Conduct Pre-Trial Investigation and Subpoena Witnesses

Petitioner argues that counsel failed to conduct an adequate pre-trial investigation because, if he had done so, he would have "realized that the officer's delay in the execution of the arrest warrant was for the sole purpose of gaining a tactical advantage" and would have successfully had petitioner's inculpatory statements suppressed.  (Rec. doc. 1, supporting brief, p. 43).  This court has already addressed and rejected petitioner's claim that counsel was ineffective in failing to inform the trial court of the delayed execution of his arrest warrant, finding that petitioner failed to show that he was prejudiced by counsel's

---

[20]The transcripts of the witnesses testifying at the hearings, along with the transcripts of the depositions of witnesses, are contained in the State rec., vol. 3 of 5.

alleged deficiency in this regard.[21]

Petitioner next argues that counsel's failure to adequately prepare a defense is exemplified by his failure to subpoena expert witnesses to refute the State's expert medical testimony regarding the injuries suffered by the victim. Specifically, petitioner claims that counsel should have obtained expert medical testimony to refute the testimony of Dr. Douglas Postels, a neurologist, who stated that the head injuries suffered by the victim were caused not just from shaking, but from the victim being thrown or swung against a stationary solid object.

Petitioner raised this same claim on post-conviction and the state district court conducted two evidentiary hearings, one on June 13, 2007 and another on July 17, 2008, considering the hearing testimony of petitioner's trial counsel, Alexander Doyle, along with the deposition testimony of Dr. Daniel Trahant, a neurologist.

Dr. Trahant provided expert medical testimony which did contradict the trial testimony offered by Dr. Postels. Dr. Trahant opined that the victim's head injury "could have been caused solely by shaking, i.e., without the necessity of the child's head coming into contact with some stationery object". State rec., vol. 3 of 5, p. 1172. However, Dr. Trahant acknowledged that the victim "suffered other injuries which indicated her body made contact with external surfaces." *Id.*

---

[21]*See supra* at p. 29.

Trial counsel Doyle, when questioned about why the defense failed to call an expert, such as Dr. Trahant, to testify at trial, informed that the failure was not the result of an oversight, but rather, was a conscious decision which he, along with Mr. Hebert, made. Doyle explained:

> [I]t was determined that it would be detrimental to Mr. Hebert's case to once again bring to the jury's attention, through the witness, the extent of the injuries suffered by the child...." [We, i.e., Doyle and Mr. Hebert] believed the testimony of such an expert would be unnecessary because of the difficulty the state would have in any event proving any specific intent by Mr. Hebert to kill the child."

State rec., vol. 3 of 5, p. 1172.

In resolving petitioner's post-conviction ineffectiveness claim, the state district court examined applicable law:

> Claims of ineffective assistance of counsel are reviewed under the two-part test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prevail, the defendant must show both that (1) counsel's performance was deficient and (2) he was prejudiced by the deficiency. With regard to the second element, i.e., prejudice, the defendant must show that any error was so serious as to deprive him of a fair trial. To carry this burden, the defendant must show that there is a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.
>
> If an alleged error by defense counsel falls within the ambit of trial strategy, it does not establish deficient performance by counsel. Because opinions may differ on the advisability of certain tactics, hindsight is not the proper perspective for judging the competence of trial counsel's decisions. Whether a particular strategy is successful is not determinative of the issue of counsel's alleged deficiencies. *State of Louisiana v. Green*, 750 So.2d 342 (La. App. 4th Cir. 1999).

State rec., vol. 3 of 5, p. 1173.

The state district court recognized the possibility that had a defense witness, such as Dr. Trahant, offered trial testimony to the effect that the victim's head injury could have been caused solely by shaking, the jury may not have found the requisite specific intent. However, the state district court also recognized that the above possibility was diminished by the fact that there was no dispute, on the part of medical experts, that other injuries suffered by victim were attributable to external trauma, i.e., that other injuries were the result of the victim coming into contact with external surfaces. Thereafter, the state district court reasoned:

> Mr. Doyle's decision, made in concert with [Mr. Hebert], not to call a medical expert witness in an attempt to contradict the state's witnesses, fell within the ambit of trial strategy. The court cannot say that the strategy was unreasonable. For that reason, [petitioner] is not entitled to post conviction relief based on his claim of ineffective assistance of counsel for failure to present medical expert testimony.

State rec., vol. 3 of 5, pp. 1173-1174.

The United States Fifth Circuit Court of Appeals recently observed:

> "[A] conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Richards v. Quarterman,* 566 F.3d 553, 564 (5th Cir.2009) (citation and internal quotation marks omitted). The prejudice prong requires a petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

*Adams v. Thaler*, 2011 WL 1304894, *3 (5th Cir. 2011).

In the instant case, the testimony of trial counsel, Alexander Doyle, clearly reflects that the decision not to call a defense medical expert was part of his trial strategy. Further, while a defense medical expert's testimony may have cast doubt on a portion of the State's expert testimony, specifically, the testimony of State expert, Dr. Postels, that the victim's head injury was the result not only of shaking, but also the result of contact with external surfaces, it would not have dispelled the evidence that other injuries suffered by the victim were the result of the victim coming in contact with external surfaces. As such, it is not reasonably probably that but for the fact that a defense medical expert was not called, the result of the proceeding would have been different. Thus, this court finds that the state district court's denial of petitioner's ineffectiveness claim, based upon counsel's failure to have a defense medical expert offer testimony at trial to counter the State's expert testimony regarding the cause of the victim's head injury, does not represent an unreasonable application of *Strickland*, *supra*, to the facts of this case. Thus, the instant claim for habeas corpus relief is without merit.

### E.  Erroneous Comment on Responsive Verdicts/Faulty Grand Jury Instruction

Petitioner alleges that his constitutional rights were violated by virtue of the trial court's erroneous comment regarding the jury's ability to return a responsive verdict. This claim was discussed and rejected by the court in connection with petitioner's claim that

counsel was ineffective in failing to object to the trial court's erroneous comment.[22]  For the reasons set forth in this court's earlier analysis, the instant claim is without merit.

Petitioner further complains that his constitutional rights were violated because the State allegedly provided members of the grand jury with improper instructions regarding the crime of attempted first degree murder in order to secure an indictment.  This claim was similarly discussed and rejected in connection with petitioner's related ineffectiveness claim.[23]  For the reasons set forth in this court's earlier analysis, the instant claim is without merit.

### F.  Failure of Grand Jury to Issue Second Indictment

As has been previously discussed, the indictment issued by the Terrebonne Parish Grand Jury charged petitioner with attempted first degree murder, providing that petitioner did unlawfully and intentionally attempt to kill or inflict great bodily harm upon one, Andrea Hebert.  The prosecutor later amended the indictment, eliminating the improper phrase, "or inflict great bodily harm upon".  Petitioner asserts that because the grand jury indictment contained this improper language, the indictment was defective and, as such, "the subsequent proceedings following the defective indictment [i.e., his trial and conviction] are null and void."  (Rec. doc. 1, supporting brief, p. 34).  However, as the state district court

---

[22]*See* discussion *supra* at pp. 30-32.

[23]*See* discussion *supra* at pp. 32-33.

correctly noted in addressing the instant claim in connection with petitioner's post-conviction application, "there is no authority for the proposition that it is a violation of a defendant's due process rights to take him to trial on a grand jury indictment containing repugnant or unnecessary allegations, such as that reflected by the language stricken by the prosecutor in this case, <u>after</u> those allegations are removed by the prosecutor by way of amendment of the indictment in accordance with state law."[24]  Thus, the instant claim for habeas corpus relief is without merit.

### G.  Prosecutor Unlawfully Allowed to Reinstate Charge Through Grand Jury

Petitioner asserts that he was initially charged by a bill of information with attempted first degree murder, but at a preliminary hearing "the charge was reduced to attempted manslaughter when the presiding judge fond [sic] that the evidence did not support a charge of attempted first degree murder." (Rec. doc. 1, supporting brief, p. 49).  Thereafter, "the prosecutor submitted the case to a grand jury and reinstituted the charge of attempted first degree murder."  *Id*. (footnote omitted).  Petitioner argues "that the reinstitution of the attempted first degree murder charge was prohibited by the doctrines of Res judicata and collateral estoppel under the Fifth Amendment to the United States Constitution."  *Id*.

In rejecting the instant argument on post-conviction, the state district court determined that petitioner's claim was "not supported by the facts or the law."  State rec.,

---

[24]State rec., vol. 2 of 5, p. 759 (emphasis original).

vol. 2 of 5, p. 764.  With regard to the lack of a factual predicate supporting petitioner's

claim, the court provided:

> This court has thoroughly reviewed all of the court records pertaining
> to the prosecution and conviction of Mr. Hebert....  At no time did any judge
> of any division...conduct a preliminary examination in this matter.  There is no
> evidence to indicate that any such preliminary examination ever occurred.

State rec., vol. 2 of 5, p. 764.

With respect to there being no legal basis for petitioner's claim, the court

observed:

> The finding of a trial court at a preliminary examination that no probable cause
> exists to hold a defendant on a particular charge, is based on the evidence
> presented at the hearing, or the lack of evidence.  The court merely determines
> whether there is probable cause to hold the defendant in custody until trial,
> subject to his right to bail.  The court's decision is not a determination of the
> ultimate issue of guilt or innocence.  Even if the decision following a
> preliminary examination is favorable to the defendant and he is released from
> custody, his release does not operate as a dismissal of the charge against him.
> The prosecutor is not precluded from pursuing a conviction by way of trial.
> As a result, concepts such as "res judicata," "collateral estoppel," and "double
> jeopardy" do not apply to prevent prosecution of the defendant despite a ruling
> favorable to the defendant at a preliminary examination.

State rec., vol. 2 of 5, p. 764.

This court likewise finds the instant claim to be without merit.  Presuming the

state district court's factual finding to be correct, the instant claim is subject to dismissal

based upon its lack of a factual basis.  Further, this court finds the state court's determination

that petitioner's claim lacks a legal basis to be correct.  Accordingly, petitioner clearly is not

entitled to habeas corpus relief.

44

**H.  Failure to Recuse Due to Conflict of Interest**

Petitioner argues that his constitutional rights were violated by virtue of the failure of the prosecutor, Mark Rhodes, to recuse himself from petitioner's case due to a conflict of interest.  Prior to petitioner's prosecution, when Mark Rhodes was in private practice as a criminal defense attorney, petitioner's parents allegedly contacted Rhodes in an effort to retain his services for the purpose of representing their son.  Petitioner asserts that Rhodes "was contacted on at least three (3) occasions and given specifics of [petitioner's] case."  (Rec. doc. 1, supporting brief, p. 53).

Petitioner raised this same claim in a supplemental memorandum in support of his state application for post-conviction relief.  In connection with said claim, the state district court held an evidentiary hearing wherein Mark Rhodes, along with petitioner's parents, Lawrence and Nora Hebert, offered testimony.  The state district court summarized the evidentiary hearing testimony as follows:

> Mr. Rhodes, the prosecutor, testified that he had no independent recollection of any conversation with the [petitioner] or members of his family while he was a private attorney handling the defense of serious felonies before he resumed his employment with the district attorney's office in June or July of 1998.  He was certain that he never talked to the [petitioner], but he could not state with certainty that he never talked to members of his family who might have tried to hire him to represent the [petitioner].  He felt certain that if any member of Mr. Hebert's family contacted him to retain him for his services, no substantive discussions about the case took place because he did not receive payment for services.  His habit was to receive advance payment in full, in the absence of which no such conversations would occur.

According to Lawrence Hebert, the defendant's father, he spoke to

45

Mark Rhodes by telephone and gave him a ten minute "rundown" on the case against his son. Mr. Rhodes promised to get back to him. A few days later, Mr. Rhodes called Mrs. Hebert and declined to take the case. Mr. Hebert was unable to report any information he gave Mr. Rhodes that might be viewed as inculpatory or otherwise detrimental to his son's case that was not already well-known to law enforcement officials. Mr. Rhodes was not a prosecutor when the telephone conversation took place.

The [petitioner's] mother Nora Hebert testified at the hearing as well. She stated that she received a telephone call from Mr. Rhodes or someone with his office advising her and her husband that Mr. Rhodes would not agree to represent her son. She had no other conversations with Mr. Rhodes.

State rec., vol. 3 of 5, p. 1174.

Based upon the above, the state district court concluded:

Even if it is assumed that the prosecutor's conversation with the [petitioner's] father before Mr. Rhodes became the prosecutor assigned to the case was more detailed than Mr. Rhodes recalls, the court has not been furnished with any evidence that any information transmitted to Mr. Rhodes by the defendant's father proved prejudicial to the [petitioner]. Because there is a lack of evidence of any prejudice suffered by the [petitioner] arising as a result of the telephone conversation between Mr. Hebert and Mr. Rhodes, no relief will be granted based on the [petitioner's] claim of prosecutorial conflict of interest.

State rec., vol. 3 of 5, pp. 1174-1175.

Based upon the above, it is clear that no actual "conflict of interest" existed.

Mr. Rhodes, the prosecutor, gleaned no information from his alleged conversations with

petitioner's parents which was prejudicial to petitioner. Thus, petitioner suffered no violation

of his constitutional rights and is not entitled to habeas relief.

46

### I.  Forum Shopping on the Part of the Prosecution

Petitioner asserts that the prosecution "shopped" around for a judge, having petitioner's case transferred to and from various sections of court in order to find a judge favorable to the prosecution.  However, even if petitioner's assertion is true, in the absence of a showing of prejudice, petitioner's claim does not warrant habeas corpus relief.  A petitioner does not have a constitutional right to have his case heard by a particular judge and, even if there is error in the selection process, a petitioner is "not denied due process as a result of the error unless he can point to some resulting prejudice."  *Sinito v. U.S.*, 750 F.2d 512, 515 (6th Cir. 1984) (citations omitted); *see also U.S. v. Osum*, 943 F.2d 1394, 1399 n. 1 (5th Cir. 1991).  However, in addressing this matter on post-conviction, the state district court studied the pertinent record and made the factual finding that petitioner's case had, in fact, been randomly allotted.  Specifically, the court provided:

> The court has reviewed the history of the charge against [petitioner] and it is apparent that the case against him truly was randomly and properly allotted. He has no valid claim that his due process rights were violated by a prosecutor who shopped for a division of court favorable to the state.

> On July 3, 1997, [petitioner] was arrested by the Houma City Police and charged with attempted first degree murder.  At that time, new cases were allotted to divisions of the 32nd Judicial District Court based on the date of a defendant's arrest.  Because the allotment schedule in effect called for the assignment of new cases against persons arrested on July 3, 1997, to Judge Walker of Division B, the case was assigned to Division B.  On August 14, 1997, the Terrebonne Parish District Attorney's office filed a bill of information against [petitioner] charging him with attempted manslaughter, not attempted first degree murder.  The bill of information was assigned docket number 296930.  [Petitioner] was properly arraigned on August 18, 1997

47

before Judge Pettigrew of Division D who promptly set his trial for November 17, 1997, before Judge Walker in Division B, the proper division of court at that time.  The trial was continued to January 12, 1998, before Judge Walker.  However, by court order dated December 23, 1997, Judge Walker recused himself and ordered the Terrebonne Parish Clerk of Court to randomly allot the case to another division of court.  The Clerk of Court complied and randomly allotted the case to Judge Wimbish of Division E.  The trial date was continued several times thereafter, to April 20, 1998, June 15, 1998, August 3, 1998, October 12, 1998, and December 7, 1998, all before Judge Wimbish.  In the meantime, Judge Wimbish conducted a hearing on a motion to quash which was denied.

On November 5, 1998, [petitioner] was indicted by the local grand jury for attempted first degree murder, based on the same facts that served as the grounds for the pending charge of attempted manslaughter. [Petitioner] was arrested on the indictment on November 18, 1998.  A new docket number, namely, 319157, was assigned to the matter and the prosecutor dismissed the previous bill of information bearing docket number 296930 on November 18, 1998.  According to the local allotment schedule, the matter bearing the new docket number 319157 for which [petitioner] was arrested on November 18, 1998, was assigned to Judge Ellender of Division C.

On December 7, 1998, [petitioner] properly was arraigned before the duty judge, Judge Gaidry of Division A.  At that time, future court dates, including a trial date, were incorrectly set before Judge Gaidry in Division A.  On February 9, 1999, [petitioner's] counsel filed a motion to transfer case number 319157 to Division E, the division in which the same matter, albeit bearing a different docket number, was pending prior to the grand jury indictment.  Mr. Hebert's attorney fixed this issue for hearing before Judge Gaidry of Division A.  On February 18, 1999, after hearing, Judge Gaidry ordered the matter transferred to Division E.  Thereafter, all proceedings against [petitioner], including the trial, were conducted in Division E.

It is clear that the proceedings against [petitioner] with regard to the original charge of attempted manslaughter, properly were randomly allotted to Division E of the 32nd Judicial District Court.  When the charge of attempted first degree murder subsequently was lodged against [petitioner] by the local grand jury, Judge Gaidry of Division A, after a hearing, properly ordered the matter transferred to Division E because it was, in substance, a continuation

of the same proceedings against [petitioner].  If Judge Gaidry had not so ordered, Mr. Hebert might then have reasonably claimed that the grand jury indictment and his subsequent arrest were designed to effect a transfer of the proceedings against him from Judge Wimbish of Division E to some other judge in the district.

There is some support for the argument that the system of allotment of cases based on the date of a defendant's arrest used by the 32nd Judicial District Court in 1997, was not a random allotment procedure required by law, and that the original assignment of [petitioner's] case to Judge Walker of Division B based on [petitioner's] arrest on July 3, 1997, was, therefore, improper.  If [petitioner's] case subsequently had not been randomly allotted, he might now have reason to complain.  However, because the first case against [petitioner] was randomly allotted to Judge Wimbish after recusal by Judge Walker, and Judge Wimbush continued to preside over the case when the charge and docket number changed as a result of the grand jury indictment, [petitioner's] complaints about the allotment procedure are unjustified.

State rec., vol. 2 of 5, pp. 754-757.

Based upon the above findings of fact, which this court presumes to be correct, petitioner's claim that he was denied due process as a result of the prosecution's forum shopping is without merit.  As such, petitioner is not entitled to habeas corpus relief.  Accordingly;

RECOMMENDATION

It is hereby **RECOMMENDED** that the application of petitioner, Rocky Hebert, for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** with prejudice.

A party's failure to file written objections to the proposed findings, conclusions,

and recommendation in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); *Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996)(*en banc*).[25]

New Orleans, Louisiana, this __21st__ day of _____April_____, 2011.


LOUIS MOORE, JR.
United States Magistrate Judge

---

[25]*Douglass* referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. §636(b)(1) was amended to extend that period to fourteen days.